**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Andrew Todd Mitchell

      v.                                    Case No. 10-cv-479-PB

Michael J. Astrue, Commissioner,
Social Security Administration

## REPORT AND RECOMMENDATION

Pursuant to 42 U.S.C. § 405(g), Andrew Mitchell moves to
reverse the Commissioner's decision denying his application for
supplemental security income, or SSI, under Title XVI of the
Social Security Act, 42 U.S.C. § 1382.  The Commissioner, in
turn, moves for an order affirming his decision.  For the
reasons given below, I recommend that this matter be remanded to
the Administrative Law Judge ("ALJ") for further proceedings
consistent with this report and recommendation.

### Standard of Review

The applicable standard of review in this case provides, in
pertinent part:

> The [district] court shall have power to enter, upon
> the pleadings and transcript of the record, a judgment
> affirming, modifying, or reversing the decision of the
> Commissioner of Social Security, with or without
> remanding the cause for a rehearing.  The findings of
> the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive
. . . .

42 U.S.C. § 405(g) (setting out the standard of review for
decisions on claims for disability insurance benefits); see also
42 U.S.C. § 1383(c)(3) (establishing § 405(g) as the standard of
review for SSI decisions).  However, the court "must uphold a
denial of social security . . . benefits unless 'the
[Commissioner] has committed a legal or factual error in
evaluating a particular claim.'"  Manso-Pizarro v. Sec'y of HHS,
76 F.3d 15, 16 (1st Cir. 1996) (quoting Sullivan v. Hudson, 490
U.S. 877, 885 (1989)).

As for the statutory requirement that the Commissioner's
findings of fact be supported by substantial evidence, "[t]he
substantial evidence test applies not only to findings of basic
evidentiary facts, but also to inferences and conclusions drawn
from such facts."  Alexandrou v. Sullivan, 764 F. Supp. 916,
917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727,
730 (2d Cir. 1966)).  In turn, "[s]ubstantial evidence is 'more
than [a] mere scintilla.  It means such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion.'"  Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st
Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401
(1971)).  But, "[i]t is the responsibility of the [Commissioner]

to determine issues of credibility and to draw inferences from the record evidence.  Indeed, the resolution of conflicts in the evidence is for the [Commissioner], not the courts."  <u>Irlanda Ortiz v. Sec'y of HHS</u>, 955 F.2d 765, 769 (1st Cir. 1991) (citations omitted).  Moreover, the court "must uphold the [Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."  <u>Tsarelka v. Sec'y of HHS</u>, 842 F.2d 529, 535 (1st Cir. 1988).  Finally, when determining whether a decision of the Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole."  <u>Irlanda Ortiz</u>, 955 F.2d at 769 (quoting <u>Rodriguez v. Sec'y of HHS</u>, 647 F.2d 218, 222 (1st Cir. 1981)).

### Background

The parties have submitted a Joint Statement of Material Facts, doc. no. 11.  That statement is part of the court's record and will be summarized here, rather than repeated in full.

In 1991, while Mitchell was at work, he fell at least fifty feet from a bucket truck onto the pavement.[1]  He suffered: (1)

---

[1] In some documents in the record, Mitchell's fall is described as being from a height of fifty feet, while other documents describe the fall as being from eighty-five feet.

3

multiple facial fractures; (2) a compound fracture of his left
wrist, ulna, and radius; (3) a compound fracture of his right
distal tibia and fibula; (4) a markedly comminuted, slightly
displaced intertrochanteric fracture of his left femur; (5)
multiple pelvic fractures; (6) contusion of his lung,
pneumothorax; and (7) contusion of his abdomen.  As a result of
those injuries, Mitchell underwent seventeen orthopedic
surgeries.  Tr. 289.  Since 1997, Mitchell's medical treatment
has consisted almost exclusively of visits to the emergency
room, with many of those visits prompted by kidney problems.  He
reports that two different physicians have told him that he
needs a hip replacement, Tr. 53, 211-13, but also reports that
he has not had health insurance since 1997 and cannot afford
medical care.  Mitchell has not engaged in substantial gainful
activity since his accident.

     At his hearing, Mitchell testified that he received
workers' compensation for his injuries.  Tr. 45.  He also
testified that he received Social Security disability insurance
benefits covering the period running from the date of his
accident through 1994 or 1995.[2]  Tr. 45-46.

---

     [2] The ALJ refers to an RFC assessment from 1995, Tr. 13
(citing Tr. 289), but that assessment does not appear to be a
part of the record.

In Mitchell's July, 2008, Field Office Disability Report, the SSA interviewer who saw Mitchell reported: "Mr. Mitchell came into the office by himself.  No difficulties observed in moving about or sitting for an hour."  Tr. 179.  The interviewer also observed that Mitchell had no difficulties with sitting, standing, walking, using his hands, or writing.  Id.

In a Function Report he completed in August of 2008, Mitchell described his daily activities: "Watch T.V. little cleaning & cooking."  Tr. 194.  He then stated that he prepared meals weekly, and that a typical meal took him fifteen to thirty minutes to prepare.  Tr. 197.  Regarding house and yard work, he stated that he did "no mowing, some repairs, cleaning & laundry."  Id.  He further stated that he performed those activities once or twice a month for fifteen to thirty minutes, and that he needed help or encouragement to perform them.  Id. He also reported that he fed a dog and a cat, Tr. 195, went outside once or twice a week, Tr. 198, could drive a car, and could pay bills and otherwise handle money, id.  He reported that he could walk 100 yards before needing to stop and rest, and that he would be in pain when doing so.  Tr. 200.  Finally, Mitchell mentioned pain in either his hips or his wrists in response to no fewer than five questions in his Function Report. Tr. 195, 197, 200.

In September of 2008, Mitchell underwent a consultative orthopedic examination performed by Dr. Frank Graf.  That examination resulted in the following findings:

> [H]is gait pattern is abnormal with shortening of stride and external rotation of both feet.  He can perform heel and toe walking but with a prominent limp as he bears weight on the right leg.  There are restrictions in both right and left hip ranges of motion with flexion on the left to 90 degrees, flexion on the right to 80 degrees and abduction on the right limited to 25 degrees.  Minimal to no internal and external rotation at the right hip.  Somewhat improved range of motion at the left hip, but still abnormal and restricted.  . . .  At the left upper extremity there is an extensor lag of 22 degrees as compared with full extension at the right elbow.  At the left wrist there is 24 degrees of dorsiflexion and 25 degrees of palmar flexion, compared with the normal right wrist of 48 degrees dorsiflexion and 44 degrees palmar flexion.  At the left forearm there is 30 degrees supination lag.  At the right forearm there is 14 degrees supination lag (considered to be normal).

Tr. 292.  Dr. Graf then offered the following statement of medical diagnoses:

> (1)   Persistent residuals of multiple fractures in work-related industrial accident of 1991.
>
> (2)   Posttraumatic progressive osteoarthritis of the right and left hips.
>
> (3)   Status post partial fusion of the left wrist with restricted ranges of motion following open forearm fracture.
>
> (4)   Restricted elbow extension on the left.

6

     (5)   Status post tibial rodding right leg with removal
          of the tibial rod.

     (6)   Chronic depression.

Id.  Dr. Graf concluded by summarizing his findings and

diagnoses:

> This patient is substantially impaired in standing,
> walking, lifting, carrying and bending tolerances by
> reason of residuals of his multiple fractures about
> the hips and pelvis.  He is also limited in power
> grip, carrying and bending at the left upper
> extremity by reason of both open forearm fractures and
> resulting partial fusion, and probable further
> injuries at the humeral ulnal and humeral radial
> joints left elbow.
>
> Currently, he is taking no medications.

Tr. 292-93.

In a Physical Residual Functional Capacity Assessment

completed in September of 2008, non-examining medical consultant

Burton Nault determined that Mitchell could occasionally lift

twenty pounds, frequently lift ten pounds, stand or walk (with

normal breaks) for a total of at least two hours in an eight-

hour workday, sit for a total of about six hours in an eight-

hour workday, and push and/or pull without limitation.  Tr. 283.

Dr. Nault also found that Mitchell could never climb ladders,

ropes, or scaffolds, but could occasionally climb ramps and

stairs, and could occasionally balance, stoop, kneel, crouch,

and crawl.  Tr. 284.  In addition, Dr. Nault found that Mitchell

had a limited ability for handling (gross manipulation), but an unlimited ability for reaching in all directions (including overhead), fingering (fine manipulation), and feeling (skin receptors). Tr. 285. The "Manipulative Limitations" section of the assessment also contains this notation: "AVOID MORE THAN OCC. MANIPULATION OF LEFT HAND." Id. Finally, Dr. Nault found that Mitchell had no visual, communicative, or environmental limitations.

However, notwithstanding the numerous allegations of pain in Mitchell's Function Report, Dr. Nault completed the "Symptoms" section of the Physical Residual Functional Capacity Assessment form in a rather cursory way. That section asks the medical consultant to do the following:

> For symptoms alleged by the claimant to produce physical limitations, and for which the following have not previously been addressed in section I, discuss whether:
>
> A.   The symptom(s) is attributable, in your judgment, to a medically determinable impairment.
>
> B.   The severity or duration of the symptom(s), in your judgment, is disproportionate to the expected severity or expected duration on the basis of the claimant's medically determinable impairment(s).
>
> C.   The severity of the symptoms(s) and its alleged effect on function is consistent, in your judgment, with the total medical and nonmedical evidence, including statements by the claimant and others, observations regarding activities of

daily living, and alterations of usual behavior
or habits.

Tr. 287.  To the above-quoted query, Dr. Nault's complete
response consisted of this: "A."  Id.

In March of 2010, Dr. Graf saw Mitchell a second time and
performed "a review of medical history combined with [an]
orthopaedic examination."  Tr. 158.  His purpose was to assess
Mitchell's "physical problems in relation to the listings of
impairments published by the Social Security Administration with
further comment as to [his] functional restrictions and work
capacity."  Id.  In addition to interpreting numerous x-rays,
Dr. Graf assessed: (1) Mitchell's gait; (2) the abduction,
flexion, and rotation (internal and external) of Mitchell's
hips; (3) the dorsiflexion, palmar flexion, and deviation
(radial and ulnar) of Mitchell's wrists; (4) the extensor lag,
supination and pronation of Mitchell's forearms; (5) the
elevation, abduction, flexion, extension, and rotation (internal
and external) of Mitchell's shoulders; and (6) Mitchell's
lumbosacral ranges of motion.  Tr. 159-60.  Dr. Graf employed
various tests and tools including: (1) a brush, smooth wheel,
and Wartenberg's pinwheel to test for sensory pattern changes;
(2) tests for Tinel sign; (3) Phalen's test; (4) the Jamar
dynamometer; and (5) the Preston pinch gauge.  Tr. 160.

Based on his examination and testing, Dr. Graf made a diagnosis that states, in pertinent part:

> Persistent residuals of multiple fractures in work-related industrial accident in 1991; posttraumatic progressive osteoarthritis of right and left hips with diminished ranges of motion . . . progressive degenerative osteoarthritis of the left hip joint with avascular changes in the left femoral head . . . probable right carpal tunnel syndrome with positive provocative clinical testing and history of nocturnal pain, numbness, and tingliness; chronic lumbosacral pain with probable degenerative disc and facet joint changes.

Tr. 161 (emphasis added).  Based on his diagnoses, Dr. Graf summarized and discussed Mitchell's condition:

> This individual has substantial and progressive residuals of his industrial accident of 1991.  He has a combination of low back pain and bilateral hip pain with restrictions in ranges of motion of low back and hip joints.  These changes represent late complica-tions of his industrial accident specifically related to left proximal femur fracture and pelvic fractures, as well as lumbosacral injury.  In addition to changes affecting gait and station and limiting tolerances for walking, bending, stooping and lifting, he also has upper extremity limitations present as a consequence of his industrial accident.  On the right, he has developed a carpel tunnel syndrome.  On the left, he has documented restriction in power grip and pinch and ranges of motion for the left wrist and hand.  His strength changes exceed the normal dominance factor right versus left upper extremity.  He has restrictions in reaching and in the performance of any overhead work by reason of secondary shoulder joint restrictions and ranges of motion. . . .
>
> It is the opinion of this examiner that the progressive changes present residual to his 1991

10

industrial accident have now rendered him disabled for all employment including sedentary employment.

Tr. 161-62.

In conjunction with his 2010 examination, Dr. Graf completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) on Mitchell.  In it, he opined that Mitchell could occasionally lift/carry twenty pounds, could frequently lift/carry ten pounds, could stand and/or walk for less than two hours in an eight-hour workday, had an unlimited ability to sit, and was limited in his ability to push/pull with both upper and lower extremities.  Tr. 154-55.  He attributed those limitations to: (1) residuals of pelvic and hip fractures; (2) left wrist fractures residuals; and (3) chronic lumbosacral pain.  Tr. 155.  Dr. Graf also opined that Mitchell could never climb ladders, ropes and scaffolds, and never crawl, but could occasionally climb ramps and stairs and occasionally balance, kneel, crouch, and stoop.  Id.  In addition, Dr. Graf found that Mitchell was limited to only occasional reaching, handling, fingering, and feeling.  Tr. 156.  With respect to Mitchell's ability to maintain attention and concentration, Dr. Graf stated: "Right hip pain & Lf hip pain limit concentration.  Left wrist pain.  Left elbow 'clicks' and is a source of pain."  Id.

11

At his hearing, Mitchell testified about the effects of his
pain.  He stated that his pain makes him unable to focus.  Tr.
55.  More specifically, he said he had adequate concentration to
read a newspaper article, but could not read a book.  Id.  He
also stated that pain affects his thinking, relationships,
social life, work life, and sleeping.  Tr. 54.

After the hearing, the ALJ issued a decision that includes
the following findings of fact and conclusions of law:

> 2. The claimant has the following severe impairments:
> degenerative joint disease of the hips and
> degenerative joint disease of the left wrist (20 CFR
> 416.920(c)).
>
> . . . .
>
> 3. The claimant does not have an impairment or
> combination of impairments that meets or medically
> equals one of the listed impairments in 20 CFR Part
> 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925
> and 416.926).
>
> . . . .
>
> 4. After careful consideration of the entire record,
> the undersigned finds that the claimant has the
> residual functional capacity to perform light work as
> defined in 20 CFR 416.967(b); he can lift 20 pounds
> maximum occasionally, perform mostly sitting with
> short amounts of walking and standing, no frequent
> manipulation with left hand and using it as an assist
> only (the claimant is right handed) and no fine or
> gross manipulation.
>
> . . . .
>
> 5. The claimant is unable to perform any past relevant
> work (20 CFR 416.965).

. . . .

9. Considering the claimant's age, education, work
experience, and residual functional capacity, there
are jobs that exist in significant numbers in the
national economy that the claimant can perform (20 CFR
416.969 and 416.969(a)).

Tr. 10, 12, 13, 14.  Based on testimony from a vocational

expert, the ALJ found that Mitchell had the RFC to work as a

telephone solicitor, a cafeteria cashier/food checker, and as a

telephone quotation clerk.  Tr. 14.

The ALJ's decision was reviewed by the Decision Review

Board ("DRB") which affirmed.  In its decision, the DRB wrote:

The Administrative Law Judge considered and properly
weighted the medical opinion of Dr. Graf, a
consultative examiner, who performed a onetime
examination.  Dr. Graf's medical opinion regarding the
severity of your work related limitations is not
consistent with Dr. Graf's examination notes regarding
objective signs, symptoms, and other clinical
findings.  Dr. Graf's medical opinion is also
inconsistent with the clinical treatment records from
contemporary medical treatment providers who treated
you at the time of your industrial accident through
the hearing date.  The hearing decision properly
considered both your credibility and whether pain
caused you work-related non-exertional limitations.

Tr. 1.

### Discussion

According to Mitchell, the ALJ's decision should be

reversed, and the case remanded, because the ALJ: (1) erred in

failing to properly credit his subjective complaints of
disabling pain; and (2) did not properly consider the medical-
opinion evidence.

To be eligible for supplemental security income, a person
must be aged, blind, or disabled, and must meet certain
requirements pertaining to income and assets.  42 U.S.C. §
1382(a).  The only question in this case is whether Mitchell was
disabled.

For the purpose of determining eligibility for supplemental
security income,

> [a]n individual shall be considered to be disabled for
> purposes of this subchapter if he is unable to engage
> in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment
> which can be expected to result in death or which has
> lasted or can be expected to last for a continuous
> period of not less than 12 months. . . .

42 U.S.C. § 1382c(a)(3)(A).  Moreover,

> [f]or purposes of subparagraph (A), an individual
> shall be determined to be under a disability only if
> his physical or mental impairment or impairments are
> of such severity that he is not only unable to do his
> previous work but cannot, considering his age, educa-
> tion, and work experience, engage in any other kind of
> substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the
> immediate area in which he lives, or whether a
> specific job vacancy exists for him, or whether he
> would be hired if he applied for work. . . .

42 U.S.C. § 1382c(a)(3)(B).

14

In order to determine whether a claimant is disabled for the purpose of determining eligibility for SSI benefits, an ALJ is required to employ a five-step process.  See 20 C.F.R. § 41.920.

> The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the [claimant's] "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the [claimant], given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20 C.F.R. § 416.920).

The claimant bears the burden of proving that he is disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  He must do so by a preponderance of the evidence.  See Mandziej v. Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v. Schweiker, 530 F. Supp. 808, 810-11) (D. Mass. 1982)).  Finally,

> [i]n assessing a disability claim, the [Commissioner] considers objective and subjective factors, including: (1) objective medical facts; (2) plaintiff's subjective claims of pain and disability as supported by the testimony of the plaintiff or other witness; and (3) the plaintiff's educational background, age, and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797
F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690
F.2d 5, 6 (1st Cir. 1982)).

As noted, Mitchell challenges two aspects of the ALJ's
decision, its assessment of his symptoms and its treatment of
the medical-opinion evidence.  The court considers each argument
in turn. Moreover, because Mitchell's first argument is
meritorious, and dispositive, the court discusses it in detail,
and gives only passing consideration to Mitchell's second
argument.

A. The ALJ's Assessment of Mitchell's Symptoms

Mitchell argues that the ALJ erred by failing to: (1)
consider the factors described in Avery, 797 F.2d at 29-30; (2)
give sufficiently specific reasons for his credibility
determination; and (3) accurately characterize the August, 2008
Function Report.  The Commissioner disagrees, arguing that the
ALJ properly considered the Avery factors and made a credibility
determination that was based on substantial evidence.

According to Social Security Ruling ("SSR") 96-7p, "an
individual's statement(s) about his or her symptoms is not in
itself enough to establish the existence of a physical or mental
impairment or that the individual is disabled," 1996 WL 374186,

16

at *2.  "A symptom is an individual's own description of his or
her physical or mental impairment(s)."  Id.  When "symptoms,
such as pain, fatigue, shortness of breath, weakness, or
nervousness," id., are alleged, SSR 96-7p prescribes a two-step
evaluation process:

> * First, the adjudicator must consider whether there
> is an underlying medically determinable physical or
> mental impairment(s) – i.e., an impairment(s) that can
> be shown by medically acceptable clinical and
> laboratory diagnostic techniques – that could
> reasonably be expected to produce the individual's
> pain or other symptoms. . . .  If there is no
> medically determinable physical or mental
> impairment(s), or if there is a medically determinable
> physical or mental impairment(s) but the impairment(s)
> could not reasonably be expected to produce the
> individual's pain or other symptoms, the symptoms
> cannot be found to affect the individual's ability to
> do basic work activities.
>
> * Second, once an underlying physical or mental
> impairment(s) that could reasonably be expected to
> produce the individual's pain or other symptoms has
> been shown, the adjudicator must evaluate the
> intensity, persistence, and limiting effects of the
> individual's symptoms to determine the extent to which
> the symptoms limit the individual's ability to do
> basic work activities.  For this purpose, whenever the
> individual's statements about the intensity,
> persistence, or functionally limiting effects of pain
> or other symptoms are not substantiated by objective
> medical evidence, the adjudicator must make a finding
> on the credibility of the individual's statements
> based on a consideration of the entire case record.

Id.  In addition:

> When additional information is needed to assess the
> credibility of the individual's statements about

17

symptoms and their effects, the adjudicator must make
every reasonable effort to obtain available
information that could shed light on the credibility
of the individual's statements.  In recognition of the
fact that an individual's symptoms can sometimes
suggest a greater level of severity of impairment than
can be shown by the objective medical evidence alone,
20 CFR 404.1529(c) and 416.929(c) describe the kinds
of evidence, including the factors below, that the
adjudicator must consider in addition to the objective
medical evidence when assessing the credibility of an
individual's statements:

> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and
> intensity of the individual's pain or other
> symptoms;
>
> 3. Factors that precipitate and aggravate the
> symptoms;
>
> 4. The type, dosage, effectiveness, and side
> effects of any medication the individual takes or
> has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, the
> individual receives or has received for relief of
> pain or other symptoms;
>
> 6. Any measures other than treatment the
> individual uses or has used to relieve pain or
> other symptoms (e.g., lying flat on his or her
> back, standing for 15 to 20 minutes every hour,
> or sleeping on a board); and
>
> 7. Any other factors concerning the individual's
> functional limitations and restrictions due to
> pain or other symptoms.

Id. at *3.  In this circuit, the seven considerations listed

above are commonly referred to as the "Avery factors."

SSR 96-7p outlines a specific staged inquiry that consists of the following questions, in the following order: (1) does the claimant have an underlying impairment that could produce the symptoms he or she claims?; (2) if so, are the claimant's statements about his or her symptoms substantiated by objective medical evidence?; and (3) if not, are the claimant's statements about those symptoms credible?  See Baker v. Astrue, Civ. No. 08-11812-RGS, 2010 WL 3191452, at *8 (D. Mass. Aug. 11, 2010) ("If after evaluating the objective findings, the ALJ determines that the claimant's reports of symptoms are significantly greater than what could be reasonably anticipated from the objective evidence, the ALJ must then consider other relevant information."); Callie v. Comm'r of Soc. Sec., Civ. No. 09-1305, 2010 WL 1424725, at *3) (D.P.R. Apr. 6, 2010) (explaining that "before weigh[ing] the credibility of a claimant's statements about pain . . . [the] ALJ must first find a lack of support in the objective medical evidence for the allegations of pain").

Here, the ALJ addressed the issue of credibility twice, once in the context of his step-two determination that Mitchell had a severe impairment, and again in the context of his step-four RFC assessment.  At step two, without stating the applicable legal standard, the ALJ determined that Mitchell's "medically determinable impairments could reasonably be expected

to cause the alleged symptoms."[3]  Tr. 12.  Next, the ALJ

determined that "the claimant's statements concerning the

intensity, persistence and limiting effects of these symptoms

are not credible to the extent they are inconsistent with the

residual functional capacity assessment."  Id.  The ALJ then

offered the following in support of his credibility

determination:

> There has been minimal orthopedic treatment since 1997
> except for emergency room visits and cardiac
> monitoring.  The claimant takes over-the-counter
> medications for pain and no medications for any
> depression.  There are no opinions regarding his
> limitations except the one-time examination by Dr.
> Graf in September, 2008 as a consultative examiner for
> the agency, the basis of which was a denial of the
> claimant's claim.

Tr. 12.  In his step-four RFC analysis, the ALJ did state the

applicable legal standard for evaluating a claimant's statements

about symptoms, but did not address Mitchell's statements or

assess their credibility.

There are several problems with the way in which the ALJ

handled Mitchell's statements about pain.  First, while the ALJ

determined that Mitchell's underlying impairment could produce

---

[3] While ALJ did not specifically identify the symptom(s) to
which he was referring, it seems clear that he intended to refer
to pain.  Moreover, while a section heading in Mitchell's
memorandum asserts that the ALJ erred in failing to consider the
effects of his "subjective complaints of pain and depression,"
Cl.'s Mem. (doc. no. 8-1), at 6, it would seem that depression
is a mental impairment rather than a symptom.

the symptom he claims, the ALJ went on to deem Mitchell's
statements not credible without first determining whether or not
those statements were substantiated by objective medical
evidence.  That was a legal error.  See Santiago v. Astrue, 2009
WL 3517611, at *8 (D. Mass. Oct. 14, 2009) (remanding where
"[t]he ALJ did not discuss . . . how [the claimant's] statements
were inconsistent with the objective medical evidence").

Moreover, on the record in this case, there does not appear
to be much support at all for a determination that Mitchell's
statements about pain are not substantiated by objective medical
evidence.  In the section of the Physical RFC Assessment form
that asked whether Mitchell alleged symptoms that were
disproportionate to what should be expected, or alleged symptoms
that were consistent with the evidence in the record, Dr. Nault
said nothing.  He did not say that Mitchell's statements were
consistent with the medical evidence, nor did he opine that
Mitchell's statements were an exaggeration.  Thus, Dr. Nault's
RFC assessment provides no support for the proposition that
Mitchell's allegations of pain are not substantiated by
objective medical evidence.

On the other hand, Dr. Graf included "chronic lumbosacral
pain" in his 2010 diagnosis, in a report that contained a large
amount of objective medical evidence that substantiates

Mitchell's allegations of pain.  Among other things, Dr. Graf
described several of Mitchell's conditions as "persistent
residuals," "progressive," "degenerative," and "late
complications" of injuries that are both well documented and
indisputably severe.  Those characterizations suggest that
Mitchell's pain-producing medical conditions are ongoing and
getting worse.

    Next, while the court does not fully endorse Mitchell's
criticism of the ALJ's application of the Avery factors (as the
ALJ did a better job than Mitchell gives him credit for) the
court nonetheless concludes that the ALJ provided an inadequate
explanation for his decision not to credit Mitchell's statements
about disabling pain.  In reaching this conclusion, the court is
mindful that it is the ALJ's job, and not the court's, to draw
inferences from the evidence in the record and to resolve
conflicts therein.  See Irlanda Ortiz, 955 F.2d at 769.  That
said, the court considers each of the three reasons the ALJ gave
for not crediting Mitchell's allegations of disabling pain.

    In the first sentence of his explanation, the ALJ said:
"There has been minimal orthopedic treatment since 1997 except
for emergency room visits and cardiac monitoring."  Tr. 12.  It
is not at all clear what bearing Mitchell's lack of post-1997
orthopedic treatment has on his allegations concerning pain, and

the ALJ does not explain the connection.  Moreover, by 1997,

Mitchell had had seventeen orthopedic surgeries.  That, as a

logical matter, would seem to limit the number of viable

orthopedic treatment options available to Mitchell after 1997,

other than the hip replacement he says he needs but cannot

afford.[4]  At his hearing, Mitchell testified that after 1997, he

had no insurance and lacked the ability to pay for medical

treatment.  That assertion is demonstrated by the fact that

most, if not all, of Mitchell's post-1997 medical treatment has

been provided by or through hospital emergency departments.  In

sum, Mitchell's lack of orthopedic treatment since 1997 is not

substantial evidence in support of the ALJ's decision that

Mitchell's statements about pain lacked credibility.

In the second sentence of his explanation, the ALJ said:

"The claimant takes over-the-counter medications for pain and no

medications for any depression."  Tr. 12.  "The type, dosage,

effectiveness, and side effects of any medication the individual

takes or has taken to alleviate pain or other symptoms," 1996 WL

374186, at *3, is one of the Avery factors.  But, the ALJ does

---

[4] If, indeed, there is medical support for Mitchell's claim
that he needs a hip replacement – and there is nothing in the
record to suggest that he does not – that would certainly seem
to support his allegation of disabling pain.  Without presuming
to have medical expertise, the court has difficulty believing
that a hip joint that is damaged enough to need replacement
would not cause a considerable amount of constant pain.

not say why the fact that Mitchell takes over-the-counter pain medication undercuts the credibility of his allegations about pain.  Because "it is not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms," id. at *2, the ALJ's reference to Mitchell's pain medication carries limited weight as support for a negative credibility determination.

In the third sentence of his explanation, the ALJ said: "There are no opinions regarding his limitations except the one-time examination by Dr. Graf in September, 2008 as a consultative examiner for the agency, the basis of which was a denial of the claimant's claim."  Tr. 12.  The record reveals that Dr. Graf examined Mitchell not once but twice.[5]  While the ALJ referred to Dr. Graf as a one-time examiner on page 12 of his decision, page 13 includes a comparison of the examination Dr. Graf gave Mitchell in 2008 with the examination Dr. Graf gave Mitchell in 2010.  Thus, the ALJ's decision is both incorrect and internally inconsistent on this point.

In addition, Dr. Graf's 2010 examination resulted not just in opinions, but in a medical diagnosis of "chronic lumbosacral pain."  Tr. 161.  That diagnosis, in turn, would seem to make

---

[5] The DRB repeats the ALJ's mischaracterization of Dr. Graf as a one-time examiner.  Tr. 1.

Mitchell's pain something more than a mere subjective complaint. In any event, as a result of the 2010 examination, Dr. Graff opined that Mitchell's chronic lumbosacral pain caused several different exertional limitations, Tr. 154-55, and that his hip pain limited his ability to maintain attention and concentration, Tr. 156. Accordingly, Dr. Graf's reports hardly count as substantial evidence in support of the ALJ's decision not to credit Mitchell's statements about pain.

To summarize, the paragraph explaining the ALJ's finding that Mitchell's statements about pain were not credible falls short of the standard described in SSR 96-7p.

Finally, while the ALJ does not expressly refer to Mitchell's activities of daily living in the paragraph explaining his decision that Mitchell's statements about pain lacked credibility, he does discuss that topic elsewhere in his decision, and the parties devote considerable attention to it. For that reason, and because activities of daily living are one of the Avery factors, the court will address the ALJ's discussion of Mitchell's daily activities.

With respect to Mitchell's activities of daily living, the ALJ wrote:

> In a document filed with his application the claimant
> reported activities of daily living that included
> helping with meals, doing light household chores, some

25

> cleaning and laundry, driving, walking 100 yards,
> feeding the dog and cat, paying bills.

Tr. 11.  Even bearing in mind the ALJ's considerable latitude as fact-finder, see Irlanda Ortiz, 955 F.2d at 769, the court cannot accept the ALJ's interpretation of Mitchell's Function Report.  In response to the question "[h]ow often do you prepare food or meals? (daily, weekly, monthly)," Mitchell responded "weekly," reported that he spent fifteen to thirty minutes doing so, and also reported that meal preparation was "slow & painful."  Tr. 197.  When asked how often he performed house and yard work, and how much time he spent on those tasks, he responded "1 or 2 times a month – 15-30 minutes."  Id.  Mitchell reported that he could drive a car and ride in a car, but also reported that he went outside only once or twice a week.  Tr. 198.  Given the frequency of Mitchell's cooking (weekly), house and yard work (bi-weekly), and driving (semi-weekly, at best), as reported in the Function Report on which the ALJ and the Commissioner rely, the ALJ's reference to cooking, housework, and driving as activities of daily living is a considerable overstatement, and not supported by any evidence in the record. In short, when viewed in its entirety, Mitchell's Function Report cannot bear the heavy reliance placed upon it by the ALJ and the Commissioner.

For all the reasons set forth above, the ALJ's decision must be reversed, and this case remanded, for a proper consideration of Mitchell's statements about pain.

B. Medical-Opinion Evidence

Because this case is being remanded for the reasons discussed above, there is no need to fully address Mitchell's arguments about the ALJ's handling of the medical evidence. Even so, in the interest of guiding the parties, the court makes the following observations.

First, Mitchell's memorandum is not very clear about identifying precisely what medical opinion by Dr. Graf the ALJ rejected but should have accepted.  That, in turn, makes it very difficult to assess the degree to which the ALJ's decision is supported by substantial evidence.  Second, it is simply not correct to say that the ALJ rejected Dr. Graf's 2010 opinion because that opinion was provided at the request of the claimant.  The ALJ did mention that fact, but did not base any aspect of his decision on it.  Third, regarding Dr. Graf's opinion that Mitchell was not capable of performing sedentary work, the court observes that the ALJ could, perhaps, have said more about why he rejected that opinion.  Mitchell's RFC is, of course, an issue reserved to the commissioner.  See 20 C.F.R. §

416.927(e)(2).  Even so, the ALJ was obligated to carefully consider Dr. Graf's opinion on that issue, <u>see</u> SSR 96-5p, 1996 WL 374183, and the court can discern no legal error in the ALJ's consideration of it.  Finally, while the ALJ should probably have been more precise in describing his evaluation of the medical opinions given by Dr. Graf and Dr. Nault, and explaining the weight he gave those opinions, Mitchell's principal arguments regarding the ALJ's handling of the medical-opinion evidence are not particularly persuasive.

## Conclusion

For the reasons given, I recommend that: (1) the Commissioner's motion for an order affirming his decision, doc. no. 10, be denied; and (2) Mitchell's motion to reverse the decision of the commissioner, doc. no. 8, be granted to the extent that the case is remanded to the ALJ for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).

Any objection to this Report and Recommendation must be filed within fourteen (14) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order.  <u>See</u> <u>Unauth. Pract.</u>

of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992);

United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

     SO ORDERED.

                         _____

                         Landya McCafferty
                         United States Magistrate Judge

Dated:  May 23, 2011

cc:  Stephen Patrick Parks, Esq.
     T. David Plourde, Esq.